**Louis J. SKINNER and Jean D. Skinner, Appellees,**

v.

**GILCREASE HILLS DEVELOPMENT CORPORATION, an Oklahoma Corporation, Appellant.**

**No. 47519.**

Court of Appeals of Oklahoma, Division No. 2.

March 9, 1976.

Released for Publication by Order of Court of Appeals April 8, 1976.

Robert P. Kelly, Bruce W. Gambill, Pawhuska, for appellees.

C. D. McDoulett, Jr., Holliman, Langholz, Runnels & Dorwart, Tulsa, and Matthew Kane, Jr., Kane & Kane, Pawhuska, for appellant.

BRIGHTMIRE, Judge.

Until November 1970 Mr. and Mrs. Skinner's home northwest of Tulsa, Oklahoma was bounded on the north by Johnson Street and a nearly level stretch of scrub-oak-laced grassland as far northward as the eye could see. Then one day big, earthmoving machines began to cut Johnson Street away. They blasted, cut and dozed until at last the street was gone. In its place was nothing. Only 38 feet

from plaintiffs' house, the northern edge of their property became a precipice—a cliff-like embankment dropping sharply downward some 23 feet to the bottom of a roadbed for a relocated, arterial trafficway built by defendant, Gilcrease Hills Development Corporation, for access to its vast subdivision development.

Plaintiffs brought this suit to recover damages consequent to the destruction of their right of ingress and egress onto Johnson Street. The jury awarded $9,000. Defendant's request for a new trial was denied so it appeals, claiming the trial court reversibly erred in (a) refusing to direct a verdict in its favor, (b) failing to instruct on a material issue, and (c) admitting photographs showing condition of plaintiffs' property during construction of the road.

I

Just beyond the city limits of Tulsa, Oklahoma to the northwest in Osage County is a subdivision called Country Club Annex. A plat of it was filed of record in 1923. It is a small addition. Along the northern border was dedicated 20 feet for a street named "Johnson." Through the middle of the 600-foot-wide platted tract is dedicated a road called "Loretta" and another along the 1,320-foot western boundary named "Lombard Avenue."

In 1968 the Skinners purchased Block 2 in Country Club Annex—a 300-foot-square piece of land lying in the northeast corner and began to occupy a house located at the intersection of Johnson Street and Loretta Avenue, being set back 38 feet from each.

Loretta Avenue running north and south in front of plaintiffs' house was surfaced with gravel and tar. Johnson Street had a blacktop surface from Loretta eastward along plaintiffs' north property line for about 100 feet or so ending with a paved turnaround drive in the Skinner yard. Westward from Loretta, Johnson was a little-used, grassed-over strip.

Adjoining the Skinners' property on the north was 1,634 acres of land acquired in July 1969 by Gilcrease Hills Development Corporation then owned by Tandy Properties, Inc. of Tulsa and Title Insurance Company of California. On April 21, 1970 defendant filed with the Tulsa Metropolitan Area Planning Commission (TMAPC) a preliminary plat showing its proposed development of the large acreage which it named Gilcrease Hills, Village II, a subdivision of Osage County. Of significance here is the fact that along the mile-long southern boundary of the subdivision defendant proposed to extend Pine Street—a street running east and west in the City of Tulsa and designated as a secondary arterial street on the Tulsa City-County Master Plan of Major Streets and Highways recommended by TMAPC and adopted by both the City Council and County Boards of Commissioners in 1968. On this plan Pine Street is shown as a major traffic artery lying in an east-west direction from the east boundary of Tulsa County and extending straight westward across Osage County to 25th West Avenue, which forms the west boundary line of the Gilcrease Hills development. At the time the master plan was adopted Pine Street ended at the Tulsa County line along Osage Drive—a north-south street forming the lower east boundary of defendant's subdivision. Had it extended straight on through westward it would have been parallel to and about 250 feet north of Johnson Street.

In its plat defendant proposed to extend Pine Street with a 100-foot right-of-way westward through its property to 25th West Avenue (lying along the southern boundary of its development) and create a limited-access, blacktop roadway 40 feet wide. However, instead of extending the street straight west as TMAPC's major street plan called for, defendant's plans called for extending Pine on westward through its property for about 600 feet, then curving it to the south until reaching Johnson Street, and then merging the south right-of-way line of Pine Street with the south right-of-way line of Johnson some 1,300 feet west of Osage Drive. The

object of the plan was to convert Johnson Street into a right-of-way for Pine, thereby increasing the amount of defendant's land available to it for development. The proposal meant that defendant would have to dedicate only 80 feet of the 100-foot right-of-way, thus resulting in a land savings of a 20-foot-wide and 3,880-foot-long strip. Relocating Pine southward also enabled defendant to avoid the existence of a mile-long strip of land 200 feet wide between Pine Street right-of-way and Johnson Street.

On May 13, 1970 defendant's proposed plat and application for zoning came on for hearing before TMAPC. After a lengthy presentation detailing plans for 7,536 dwellings on the 1,634-acre tract, the minutes reflect this:

"Protestants Comments:

"Mr. Skinner stated that he was one of the two persons that this application will ruin. Pine Street as a secondary arterial (4-lane) will necessitate a land cut and since my residence is on a hill, the street will be approximately 10–15′ from my rear property line straight down and it will make it dangerous for me to step out my back door."

Whether anyone understood this plea is not clear because the next thing recorded is a discussion about other things followed by a staff recommendation that one of several zoning applications be approved.

On June 17, 1970 TMAPC met to consider defendant's application. As recorded in the minutes, "the Planning Commission voted unanimously to waive the Subdivision Regulations to allow the length of the culs as shown . . . and to approve the preliminary plot of Gilcrease Hills Village II . . . subject to the following conditions." There followed a long list of intra-developmental conditions, none of which, however, were designed or intended to protect the rights of the Skinners or any other landowner in the area.

The record discloses that neither the courts nor the Board of Osage County Commissioners took any action on defend-

ant's application with reference to its proposed use of Johnson Street nor did the board purport, by official act or otherwise, to vacate, eliminate, relocate, or change the existing grade of Johnson Street.

Nevertheless, defendant began work on the extension of Pine as a major accessway to its development. Pictures taken by plaintiffs reveal that by July 1971 Johnson Street had been completely destroyed along plaintiffs' north boundary and in its place was a steep, sandstone embankment reaching down 23 feet to the rocky roadbed of Pine Street below.

II

Defendant begins its argument by saying that under these circumstances the court should have directed a verdict in its favor because plaintiffs failed to prove an essential basis for recovery—namely, that there had been a change of an earlier-established grade of Johnson Street. The argument is that in this state an adjoining property owner may not recover damages resulting from a grade change where the existing grade had not been officially established, unless the new grade is unreasonable, citing *Penix v. City of Stillwater*, 164 Okl. 38, 22 P.2d 928 (1933); *City of Yale v. Noble*, 113 Okl. 106, 239 P. 463 (1925); *City of Mangum v. Todd*, 42 Okl. 343, 141 P. 266 (1914). Continuing on, defendant says plaintiffs here knew when they bought their property that the legislature had in 19 O.S.1963 § 863.9 granted TMAPC authority and "jurisdiction" to determine "the location and grade level for all the streets within the five-mile perimeter of the City of Tulsa, including Johnson Street."

Finally, defendant suggests that if there was sufficient evidence to make out a submissible case, then the same law gave rise to a factual issue of whether what was done to Johnson Street was reasonable—a fundamental issue requiring the court to instruct concerning it on its own motion.

III

■ Defendant misconceives the primary function of TMAPC when it says the

commission has the "authority" or "jurisdiction" to determine the location and grade level for all streets within the five-mile perimeter of Tulsa. This authority it does not have. TMAPC is a recommendatory body statutorily authorized to act as a technical and ministerial arm of two legislative bodies—the City Council and the Boards of County Commissioners. Whatever TMAPC's authority might be, it clearly does not extend beyond planning and approving proposed plats of *unplatted* land. It has no direct power to change the grade of or to vacate existing streets. It can effect such changes only indirectly as incident to its plat-approving authority. It cannot on its own initiative change land use or eliminate streets in previously platted land for which no request has been made by the landowner.

Before going further into the planning-commission aspect of defendant's argument we turn to its primary premise, namely, that the facts of this case bring into play the change of grade principles developed in the cases it cites. A proper understanding of the problem requires that we do two things: (1) prepare a definitive statement of the grade-change principle urged and (2) determine whether the rule is applicable to the facts here.

The earliest case to deal with the subject after Oklahoma gained statehood is *City of Mangum v. Todd,* supra. There the precise question answered was whether a city was liable to an abutting property owner for consequential damages arising from the establishment of an original street grade under the constitutional proscription against damaging or taking private property for public use without just compensation? In answering the question negatively, the court leaned on a broad public policy of encouraging the creation and growth of cities and the fiction of implying an advance consent of a purchaser of undeveloped city property to a later establishment of a street grade by the municipality. But, cautioned the court, "This power in the municipality must necessarily be limited to a reasonable and intelligent

exercise thereof; where it is exercised beyond this, say, in an unusual and utterly unnecessary manner, in a way that reasonable men could not have thought, at the time of purchase, would ever be pursued, it might be that consequential damages would be allowed, on the theory that the conduct of the municipality amounted to such disregard of duty as to amount to negligence, and because it could not be said that such an exercise of the power could have been contemplated or reasonably expected, and therefore assented to by the owner at the time of purchase."

The court cited the *Todd* holding with approval in *City of Yale v. Noble,* supra, and in *Penix v. City of Stillwater,* supra. Later, the *Todd* principle was restated in *Oklahoma City v. Drinkwater,* Okl., 271 P.2d 1108 (1954) thus: "If . . . the city used the power vested in it to fix grades in an unreasonable, unusual, and unnecessary manner, in a way that reasonable men could not have anticipated at the time of purchase would ever be pursued so that it could not have been assented to by the owner at the time of purchase . . . or if the city by its conduct without formal ordinance adopted the grade in existence when Belle Isle Addition was incorporated in the city limits it is bound by such conduct . . . and defendants are entitled to recover whatever consequential damages they have suffered by reason of the change of grade." In effect Oklahoma City was estopped to deny it had fixed an original grade where it had recognized a grade in one of its additions for more than 20 years, had maintained the street, and had "allowed property owners to expend large sums of money for improvements in reliance upon the grades long existing"; and, consequently, it had to pay plaintiff for the detrimental consequences of a 14-foot change of grade.

Granted the foregoing is the law, at least one problem arises when we attempt to apply these cases to the facts here. First and foremost, plaintiffs' property is not within the limits of any city, nor has any municipality changed or authorized a

change in Johnson Street. This is important because each of the cases relied on by defendant involves the construction of statutes specifically empowering a municipality to establish and change street grades within its limits, beginning with § 722, Comp. Laws 1909, cited in *Todd,* to those which today are referred to as 11 O.S.1971, §§ 81 & 82,[2] the latter section of which is cited in *Drinkwater.* Certain it is that these statutes grant neither the City of Tulsa nor TMAPC any power to change the grade of roads outside the city limits. Perhaps as an implied recognition of this fact defendant turned to TMAPC and, as we mentioned earlier, argued it had "jurisdiction to determine the location and grade level for all the streets within the five-mile perimeter of the City of Tulsa, including Johnson Street." This brings us back then to the problem of determining what authority TMAPC actually does have with reference to roads within its sphere of concern and more specifically the effect of its action in "approving" defendant's proposed plan incorporating the use of land it did not own situated in an adjoining, platted addition, for, because as we said earlier, any authority it may have over street locations and grades arises only as incident to and is limited to whatever power it has to plan land use and approve plats.

Plaintiffs' land and Johnson Street are located in Osage County about a half mile west of the City of Tulsa limits and it is therefore well within a five-mile perimeter of the City of Tulsa. Does 19 O.S.1971 § 863.9 give the TMAPC the power under the circumstances to change the grade of, relocate, or destroy Johnson Street as defendant maintains? From all that appears in the record TMAPC is operating under the provisions of 19 O.S.1963 §§ 863.2–863.19 as the joint planning arm of Tulsa County and the City of Tulsa. The City of Tulsa has heretofore annexed a small part of Osage County apparently to escape the statutory exclusion, from the five-mile range, of territory in that county which lies within the municipality's five-mile planning zone.[3]

So far as we can tell from the record the Osage Board of County Commissioners has never taken any action in regard to Johnson Street, nor apparently in regard to the relocation of Pine Street.

There is, in our view, a clear distinction between approving a plat of *defendant's land* and approving defendant's plan to use Johnson Street, an existing dedicated street on land it does not own, as a right-of-way extension of Pine Street, a major artery relocated from the location established by the City of Tulsa when it adopted its master street plan in 1968—a relocation plaintiffs could hardly have anticipated when they bought their property.

■ We hold TMAPC in approving defendant's plat had no power to authorize it to use other than its own land.

2. 11 O.S.1971 § 81 states:
"Any city or incorporated town in the State of Oklahoma is hereby empowered to establish and change the grade of any street, avenue, lane, alley, or other place, and to permanently improve the same by grading, paving, constructing, macadamizing, chatting or graveling, curbing, guttering, draining and otherwise improving the same, including the installation of the necessary manholes, catch basins, inlets and drainage pipes, sewers with necessary connections thereto for the purpose of providing for the adequate disposition of surface water falling on such improvements or carried thereon, the construction or reconstruction of sidewalks, and to make all necessary water, gas and sewer connections, whenever the public necessity may require such improvements, subject only to the limitations prescribed in 11 O.S.1951, Section 71–269 as amended."
11 O.S.1971 § 82 states:
"No change of any grade previously established by such city or incorporated town shall be made without making due compensation to the owners of abutting property for any damage thereby caused to the permanent improvements erected thereon with reference to the grade so previously established; provided, however, that the failure to make such compensation shall in no wise invalidate such assessments on the property chargeable therewith as hereinafter provided."

3. See 19 O.S.1971 § 863.2.

Beyond this, however, is the fact that we do not agree that TMAPC either established or authorized a "change of grade" of Johnson Street as such. The most that can be said is that in approving defendant's plat it purported to authorize defendant to constructively vacate the street and use the property it was located on as a right-of-way for Pine Street—the relocated major traffic artery defendant wanted and needed for access to its large development. And for this, as indicated earlier, we can find absolutely no basis, either in the planning statutes, the TMAPC regulations, or otherwise.

When defendant blasted and cut Johnson Street away it did so at its peril. It deprived plaintiffs of a "special" and "valuable property right" they owned—that of ingress and egress to and from their property and Johnson Street, even though another street abuts their property affording ingress and egress. *Siegenthaler v. Newton,* 174 Okl. 216, 50 P.2d 192 (1935); *Barnes v. Clark,* Okl., 364 P.2d 693 (1961). TMAPC, regardless of its authority, or lack thereof, could not "authorize the appropriation of or damage to the property rights of private persons by the" Gilcrease Hills Development Corporation, requiring the latter to respond for any damages caused by its acts. *Atchison, T. & S. F. Ry. v. Terminal Oil Mill Co.,* 180 Okl. 496, 71 P.2d 617 (1937). Quite aside from the law, a minimal degree of common decency, we think, would have generated enough concern for the dangerous alteration of plaintiffs' north boundary to have resulted in the 20-foot strip being left intact as a buffer between plaintiffs' lot line and the precipitous drop off. Requiring such a plat modification would have been an appropriate "staff" recommendation, particularly when the evidence was that had defendant requested to cut Pine Street straight through it would have been approved.

For these reasons, if no other, the court did not err in refusing to direct a verdict for defendant or give its requested instruction.

IV

Defendant's second proposition—that error was committed in allowing in evidence photographs taken during the construction of Pine Street—we conclude is without merit. The pictures had some relevance in graphically conveying to the fact-finders what the general appearance of the area, including the subsurface, looked like at the time Johnson Street was eliminated. In any event, we fail to see how they could have prejudiced defendant. No claim is made that the award was excessive. Indeed, as we read the record it was well within the evidence on the subject. And we are not unaware of the fact the jury declined to award punitive damages authorized by the instructions.

Since we find no reversible error in the proceedings below, the judgment and order appealed from is affirmed.

BACON, P. J., and NEPTUNE, J., concur.